## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**FERRARA FIRE APPARATUS, INC.**                                            **CIVIL ACTION**

**VERSUS**

**JLG INDUSTRIES, INC. AND**                                                **NO. 08-285-C-M2**
**GRADALL INDUSTRIES, INC.**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, December 21, 2009.

_____

MAGISTRATE JUDGE CHRISTINE NOLAND

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**FERRARA FIRE APPARATUS, INC.**                    **CIVIL ACTION**

**VERSUS**

**JLG INDUSTRIES, INC. AND**                        **NO. 08-285-C-M2**
**GRADALL INDUSTRIES, INC.**

### MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract and/or Breach of Partnership/Joint Venture (R. Doc. 25) filed by defendants, JLG Industries, Inc. ("JLG") and Gradall Industries, Inc. ("Gradall")(collectively "defendants" or "JLG/Gradall"). Plaintiff, Ferrara Fire Apparatus, Inc. ("FFA"), has filed an opposition (R. Doc. 32) to defendants' motion, in response to which defendants have filed a reply memorandum (R. Doc. 36). The Motion for Summary Judgment on Counterclaim (R. Doc. 26) filed by defendants, JLG and Gradall, was also referred to the undersigned on September 15, 2009 for disposition; however, that motion has already been disposed of by the Court through a ruling dated June 16, 2009 (R. Doc. 30) and therefore will be denied as moot.[1]

### FACTS & PROCEDURAL BACKGROUND

FFA filed this suit in the 21st Judicial District Court, Parish of Livingston, State of Louisiana, on April 4, 2008. In the Petition for Damages, FFA alleges that it is in the

---

[1] On June 16, 2009, District Judge Tyson issued a Judgment of Dismissal (R. Doc. 30), dismissing with prejudice the counterclaim filed by JLG and Gradall against FFA, with each party to bear its own costs relative to that claim. Such "Judgment of Dismissal" renders defendants' motion for summary judgment on its counterclaim moot.

business of manufacturing and selling fire trucks and firefighting apparatus and that, in July 2004, it entered into a partnership or joint venture agreement with JLG, whereby FFA was granted the "exclusive rights" to distribute and sell the product currently designated as the "Strongarm" worldwide in exchange for FFA's development and marketing of the "Strongarm" product.[2]   FFA further alleges that it and JLG agreed to "general terms governing the partnership or joint venture," which are set forth in a document attached to the petition as Exhibit "A."   Exhibit "A" is a document entitled, "JLG Industries Partner Agreements" (hereinafter referred to as the "Partner Agreement").   That document provides that it is an "agreement between JLG Industries Inc. and Ferrara Fire Apparatus," which "set[s] the guidelines for [JLG's] Legal Department to draft the final agreement."   *See*, Exhibit "A" to the Petition and Exhibit "A" to defendants' present motion.[3]

---

[2] The "Strong Arm" is described on its website, www.strongarmfirefighting.com, as a firefighting vehicle that featured a remote control Gradall boom mounted on an FFA heavy duty aluminum body with an Inferno Cab and chassis.  It is equipped with a 5th Man piercing water head and can be used to "penetrate roofs, walls and windows, releasing a massive broken stream apron of water on the source of the fire - all with remote controls designed to keep firefighters off burning roofs and out of harm's way."  Thus, the "Strong Arm" consists of three basic parts: an American Eagle Fifth Man nozzle, a Gradall FA-50 telescoping boom, and an FFA fire truck chassis and cab.

[3] The "Partner Agreement" is signed by the Vice President of Excavator Sales and Marketing for JLG, Mike Haberman, and the President and CEO of FFA, Chris Ferrara.  *Id.*  It provides the following as to JLG:  (1) Exclusivity with FFA; (2) Co-marketing rights to use FFA; and (3) FFA will purchase the standard FA47Gradall "Strong Arm" and 5th Man attachment for $200,000 FOB New Philadelphia, OH (renegotiate price after 25 units).  *Id.*  The "Partner Agreement" further provides the following as to FFA: (1) Exclusivity in advertising with JLG; (2) Initial Price for standard FA47 Gradall "Strong Arm" and 5th Man attachment installed to FFA chassis to be $200,000 FOB New Philadelphia, OH (renegotiate price after 25 units); (3) Preferred Pricing Scale– $50,000 premium ($250,000) to any other manufacturer: $20,000 to Eagle Fire, $15,000 to FFA, $15,000 to JLG; (4) Co-Marketing rights to use "Strong Arm" by Gradall; and (5) Warranty term 12 months from date of delivery to end use customer.  *Id.*

FFA asserts that both it and JLG subsequently transacted business pursuant to the general terms of the "Partner Agreement" and "operated continuously" under that agreement.[4]  According to the deposition testimony of FFA's President and CEO, Chris Ferrara ("Mr. Ferrara"), which has been submitted in connection with the present motion, he believed that the partnership/joint venture agreement with JLG/Gradall was based upon three (3) things:  (1) the 2004 "Partner Agreement;" (2) an August 26, 2004 letter announcement from Gradall; and (3) various verbal assurances between the parties.[5]

The August 26, 2004 letter announcement to which Mr. Ferrara referred in his deposition was drafted on Gradall letterhead and stated the following, in part:

> The "Strong Arm" is a new revolutionary multi-function firefighting vehicle developed under an exclusive joint-venture proprietary manufacturing agreement between Gradall and Ferrara Fire Apparatus, Inc. of Holden, Louisiana.

---

[4] According to the petition, Gradall is the legal successor of JLG and is therefore bound by and subject to the terms of the partnership or joint venture agreement, as JLG would be.

[5] *See*, Deposition of Mr. Ferrara, attached to defendants' motion as Exhibit B, pp. 31-32, where the following exchange occurred:

> Q.   In February of 2008, did you believe that you had a written agreement between Ferrara and Gradall that governed the relationship between the parties?
>
> A.   Yes.
>
> Q.   And that's Exhibit "A" [the "Partner Agreement"], correct?
>
> A.   Exhibit "A," Exhibit "B" [August 26, 2004 correspondence] and the verbal conveyances that were said."

*See*, Exhibit B to defendants' motion, pp. 31-32.

The "Strong Arm" has been designed and engineered in a cooperative endeavor between Gradall and Ferrara's engineering and design teams to insure this revolutionary firefighting tool is capable of withstanding the extreme environments and adverse conditions emergency fire and rescue apparatus are subjected to day in and day out.

Both Gradall and Ferrara share equally in our commitment to provide emergency fire and rescue personnel with the most technologically advanced firefighting vehicle on the world-wide market today . . .

The "Strong Arm" firefighting vehicle, the Gradall FA-50 tele-boom, and all other products designed and developed under this program are protected under the proprietary sales, marketing and manufacturing agreements executed by Gradall and Ferrara Fire Apparatus, Inc.

*See*, Exhibit "A-2" to FFA's opposition, R. Doc. 32.

FFA contends that, pursuant to its partnership or joint venture agreement with JLG/Gradall, it has expended several hundred thousand dollars and invested significant man hours to develop the product currently designated as "Strongarm" and to market it worldwide and that, over the past several years, it has acted as and been recognized as the "sole and exclusive distributor" of that product.  FFA contends that, on February 8, 2008,  Gradall "purported to terminate" the relationship between it and FFA.  FFA further contends that the alleged grounds for such termination are a "pretext and were never a requirement for the partnership or joint venture between the parties."  To the extent Gradall is currently offering, or intends to offer, sales or distributorship agreements to third parties with respect to the product currently designated as "Strongarm," whether under the product's current name or another name, FFA asserts that such actions are a direct violation of the partnership or joint venture agreement between FFA and JLG/Gradall. Finally, FFA alleges that the granting of distributorship rights in the product currently

4

designated as "Strongarm" to third parties also constitutes a breach of fiduciary duty and/or an unfair trade practice on the part of Gradall.

Through this suit, FFA seeks a judgment declaring that a partnership or joint venture agreement exists between it and JLG/Gradall pursuant to the general terms and conditions set forth in Exhibit "A" to the petition (*i.e.*, the "Partner Agreement") and pursuant to the general course of dealing in the ongoing relationship between the parties.  FFA also prays that a judgment be issued against Gradall, permanently enjoining and restraining it from offering to enter, entering, or honoring any agreements with third parties to advertise, market, sell or distribute the "Strongarm" worldwide.  FFA further seeks damages from JLG/Gradall for all breaches of the partnership or joint venture agreement, including but not limited to, lost sales opportunities and loss of profits incurred by the sale of the product currently designated as "Strongarm" through any other third party seller or distributor. Finally, in the alternative, FFA requests damages in equity for the loss of its investment costs to develop and market the product currently designated as "Strongarm," pursuant to La. Civ. C. Art. 2298, *et seq.  Id.*

Defendants have now filed the present motion for summary judgment, seeking dismissal of FFA's claims on the grounds that FFA will be unable to establish the existence of an enforceable contract with JLG/Gradall; and even assuming there exists an enforceable contract between the parties, it does not meet the legal prerequisites for a partnership or joint venture, and Gradall properly terminated that contract.

## **LAW & ANALYSIS**

## I.       **Summary judgment standard:**

Summary judgment is appropriate where the pleadings, discovery products, and

affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[6]  Only if the nonmoving party sets forth specific facts and evidence supporting the allegations essential to his/her claim will a genuine issue of material fact be found to exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[7]

## II.    Is summary judgment appropriate in this case?

### (A)    Does a partnership/joint venture agreement exist?

As mentioned above, the first element of relief sought by FFA in this suit is a declaratory judgment that a partnership or joint venture agreement exists between it and JLG/Gradall "pursuant to the general terms and conditions set forth in the 'Partner Agreement' and pursuant to the general course of dealing in the ongoing relationship between the parties."  Under Louisiana jurisprudence, the fundamental elements of a joint venture are generally the same as those for a partnership; as such, joint ventures are

---

[6] In reviewing a motion for summary judgment, a court " . . .must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh evidence."  *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

[7] The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law.  *Id.*

governed by the law of partnership.  *Transit Management of South Louisiana, Inc. v. Group Ins. Admin.*, 226 F.3d 376 (5th Cir. 2000).  A partnership is defined under Louisiana law as "a juridical person, distinct from its partners, created by contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit."  *Transit*, at 384, quoting La. C.C. art. 2801.  Thus, Louisiana courts have recognized the following seven (7) elements as being required for a partnership or joint venture to exist:  (1) a contract between two or more persons; (2) a juridical entity or person is established; (3) contribution by all parties of either efforts or resources; (4) the contribution must be in determinate portions; (5) there must be joint effort; (6) there must be a mutual risk vis-a-vis losses; and (7) there must be a sharing of profits.  *Cajun Elec. Power Co-op., Inc. v. McNamara*, 452 So.2d 212, 215 (La. App. 1 Cir. 5/30/84).[8]  Applying those elements to the present case, the Court finds that FFA has come forward with sufficient evidence demonstrating that there are genuine issues of material fact for trial as to whether there is a partnership/joint venture agreement between it and JLG/Gradall, precluding summary judgment.

_____

[8] Neither labeling an agreement as a joint venture or partnership nor making reference to the members of the agreement as "joint venturers" or "partners" is dispositive of the inquiry as to whether or not the parties to an agreement are joint venturers under the law because "[t]he legal relationship of parties will not be conclusively controlled by the terms which the parties use to designate their relationship, especially with regard to third parties.  Courts look to the totality of the evidence and not just to the written agreement between the parties to determine whether a joint venture was entered into."  *Id.*, at 383, quoting *Cajun Elec. Power Co-op., Inc. v. McNamara*, 452 So.2d 212, 215 (La. App. 1 Cir. 5/30/84).  *See,* 7 Glenn G. Morris & Wendall H. Holmes**,** *Louisiana Civil Law Treatise: Business Organizations* §109 and n. 2 (1999)("Despite the rule that the existence of a partnership depends on the intention of the parties, it is also well established, perhaps to a fault, that the label attached by the parties to their relationship will not control whether it is to be treated, legally, as a partnership").

**(1)   Enforceable contract element:**

As to the first element of the partnership/joint venture analysis, it remains genuinely disputed as to whether the "Partner Agreement" executed by the parties in 2004, the August 26, 2004 letter from Gradall to third parties, and the general course of business dealings between the parties in accordance with those documents constituted an enforceable contract between FFA and JLG/Gradall.  An enforceable contract need only result from a lawful agreement regarding a certain object by consenting parties who have the capacity to contract.  *See, Worley v. Chandler*, 44,047 (La. App. 2 Cir. 3/4/09), 7 So.3d 38 (The four (4) elements of a valid contract are:  (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose).  The 2004 "Partner Agreement" appears to satisfy all of those elements.   There has been no contention by the parties that either FFA or JLG/Gradall lacked the capacity to contract or that the individuals who signed the "Partner Agreement" (*i.e.*, JLG's Vice President of Excavator Sales and Marketing and FFA's President and CEO) lacked the authority to execute contracts on behalf of their respective employers at the time the 2004 "Partner Agreement" was executed.  Furthermore, there is no evidence before the Court suggesting that either party to the "Partner Agreement" was coerced into signing that document.  Notably, the "Partner Agreement" is the only document setting forth terms for the relationship between the parties that is actually signed by representatives of both parties; all drafts of subsequent, more detailed agreements were never signed by representatives of both parties.  Finally, the agreement concerns a certain object and was entered into for a lawful purpose (*i.e.*, the design, engineering, and marketing of the "Strong Arm" device).

The agreement even contains other terms not required for an enforceable contract, such as prices for the "Strong Arm" device, the cost for Gradall's component parts, and provisions regarding exclusivity of rights, warranties, etc.[9]

The defendants, however, contend that the "Partner Agreement" is not an enforceable contract and that it was only a preliminary "agreement to agree" to an enforceable contract at some later date since it states that it was "to set the guidelines for [JLG's] Legal Department to draft the final agreement," and they assert that, despite subsequent negotiations among the parties, such "final agreement" was never completed and signed by the parties.  Defendants therefore contend that no enforceable contract exists between them and FFA.[10]  Louisiana law, however, recognizes the enforceability of preliminary agreements under certain circumstances.  *Newport, Ltd. v. Sears, Roebuck & Co.,* 6 F.3d 1058 (5th Cir. 1993).  The "settled jurisprudence" of this State recognizes that an agreement between parties, where their minds have met upon all essentials, constitutes a contract between them and binds them at once although they may have agreed that they would thereafter execute a formal instrument containing the terms of their present agreement.  *Id.*, at 1065.  Thus, a so-called preliminary agreement may be binding, even though it refers to a future written agreement finalizing its contents.  *Id.,* citing *Chevron*

---

[9] JLG/Gradall concedes that the "Partner Agreement" contains an agreement on the thing and the price.  *See*, R. Doc. 25-2, p. 20.

[10] Even if the parties planned to execute a more detailed, final agreement containing additional terms and they exchanged several versions of a draft final agreement that were never agreed to and signed by both parties, that fact does not preclude the 2004 "Partner Agreement" from being an enforceable contract between FFA and JLG/Gradall if that agreement meets the criteria for a valid contract under the law.

*USA, Inc. v. Martin Exploration Co.*, 447 So.2d 469 (La. 1984).

In *Chevron USA, Inc. v. Martin Exploration Co.*, the Louisiana Supreme Court noted that the fact that an agreement is "preliminary" does "not preclude the agreement from being final until later agreements are reached, or from being the only agreement in the event no other agreements are confected." *Id.*, at 472. In fact, the Supreme Court specifically found that reference within a preliminary agreement to a document "finalizing the points listed above" does not necessarily evince an intent to be bound only upon the execution of a later instrument. *Id.* The Supreme Court noted that allusion to future "negotiations" does not automatically render the preliminary agreement non-binding, and it held that the "preliminary agreement" at issue in *Martin Exploration* was binding because that interpretation most accurately reflected the intentions of the parties in that case. *Id.*[11]

Thus, the issue of whether the 2004 "Partner Agreement" executed by the parties in this case constitutes a binding contract or whether such a contract would only exist after the execution of a later, more comprehensive document depends upon the intentions of the parties. *Newport*, at 1065. The parties' intent is a question of fact that remains in significant dispute. As noted above, the deposition testimony of Mr. Ferrara indicates that he believed the "Partner Agreement," along with the August 26, 2004 letter announcement

---

[11] *See also, Dickerson v. Cajun Communications of Texas, Inc.*, 40,026 (La. App. 2 Cir. 8/17/05), 910 So.2d 477 (holding that a "letter of intent" constituted a contract between a former employer and its former employee, which provided for severance pay absent any trial period, even though the "letter of intent" stated that a "formal agreement" would follow within thirty days of the beginning of the parties' association. The court based such holding upon the fact that the "letter of intent" stated that it was an agreement, was typed and signed on behalf of the former employer, and stated that the former employee was to receive ninety days of compensation if he was terminated by his former employer during the first six to nine months, and the former employee went to work for the former employer under the terms of the letter of intent).

sent by Gradall, set forth the "essentials" of FFA's relationship with JLG/Gradall and was

the contract between the parties,[12] while JLG/Gradall contends either that no contract

---

[12] The Affidavit of Mr. Ferrara also provides the following:

> 5)   A document drafted in 2004 and entitled the "Partner Agreements" was prepared and executed by the parties for the purpose of outlining certain key terms pertaining to the relationship between FFA and JLG/Gradall.  FFA required several essential terms of the partnership to be put in writing before the Strong Arm venture could move forward.  Specifically, FFA needed to know what the FA-50 and Fifth Man Nozzle components would cost and, more importantly, FFA required assurances that the relationship was exclusive.  The parties also needed assurances that they could utilize both corporate names in advertising and marketing the Strong Arm.  In order to justify the investment of significant time and money in the Strong Arm venture, FFA required assurances that its efforts to develop and market the Strong Arm product, as well as the Strong Arm concept, would be protected in the marketplace.  Exclusivity was an essential element of the relationship for FFA.  FFA required that Gradall would not sell the Strong Arm components to any other Fire Service manufacturers once the product was developed and the Strong Arm concept was successfully marketed;

> 6)   Other rights and obligations of the parties were established verbally or developed, based upon the relative expertise of the parties, and as the project evolved over time.  Because the Strong Arm product was so new and innovative, it was impossible in 2004 to outline all the responsibilities and rights of the parties.  However, all key essential elements of the partnership were agreed upon by August, 2004.

*See*, Exhibit "A" to FFA's opposition, ¶¶5-6.  Thus, it appears that Mr. Ferrara intended and believes that the terms set forth in the 2004 "Partner Agreement" constitute a memorialization of the basic terms of the ongoing relationship between FFA and JLG/Gradall and that both parties understood their duties despite the fact that many of the terms of their relationship were never subsequently committed to writing.  *Id.*, ¶21.

11

existed between them or that some later agreement, such as the "Product Sale Agreement"

signed by Gradall on December 9, 2005 (but never signed by FFA)[13] or the "Term Sheet"

dated September 21, 2004 (signed by FFA but never signed by Gradall), constituted the

contract. *Id.*[14] [15]

_____

[13] Gradall's president, Haberman, testified that he believed the "Product Sale Agreement" was the governing document for the relationship between FFA and Gradall. *See*, Deposition of Haberman, Exhibit G to JLG/Gradall's motion, p. 23.

[14] Although defendants contend that the "Partner Agreement" is not an enforceable contract, they nevertheless state in their present motion that, after an initial meeting between Mr. Ferrara; Gradall's president, Michael Haberman, and Gradall's Market Development Manager, Michael Norman, in March or April of 2004, the parties "reduced to writing their intent to continue working together" in the "Partner Agreement." *See*, R. Doc. 25-2, p. 3.  Thus, even though JLG/Gradall argues that the "Partner Agreement" was only a preliminary "agreement to agree," they nevertheless concede that such agreement evidenced an intent to work together on the "Strong Arm" project, and subsequent to the execution of that agreement, they worked with FFA on that project in accordance with that agreement, despite the fact that a formal, written contract including the terms of the "Partner Agreement" was never executed.  *See*, JLG/Gradall's reply memorandum, where it admits same, R. Doc. 36, p. 1 ("Following the execution of [the "Partner Agreement"], and while the parties were trying to finalize the terms of their relationship, the parties engaged in a cooperative effort to sell and market the Strong Arm").

[15] The fact that certain terms, such as the duration of the contract and a method for its termination, are not included in the "Partner Agreement" or the August 2004 Gradall letter is not fatal to the enforceability of the contract between the parties. *Caston v. Woman's Hospital Foundation, Inc.*, 262 So.2d 62 (La.App. 1972)(The stipulation of a term is not necessary to the existence of a valid contract).  As mentioned above, neither of those terms are necessary for the formation of a valid contract, and as FFA notes in its opposition, the Louisiana Civil Code and Revised Statutes set forth various suppletive provisions that are applied to contracts (including partnerships) where particular terms, such as duration and methods of termination, are left unexpressed by the contract.  *See*, La. C.C. art. 1778 (concerning an uncertain term for performance) and La. C.C. arts. 2826-2835 (concerning termination, continuation, liquidation of partnership).  Thus, the fact that Mr. Ferrara admitted during his deposition that some of the contracts he signs on behalf of FFA contain additional terms relating to duration, termination, penalties, dispute resolution, etc. does not indicate that he believed that the "Partner Agreement" was not an enforceable contract between the parties.  *See*, Deposition of Mr. Ferrara, Exhibit B to JLG/Gradall's motion, p. 34-36.

Furthermore, the August 26, 2004 letter from Gradall to third parties explaining that it had an "exclusive joint-venture proprietary manufacturing agreement" with FFA and was engaged in a "cooperative endeavor" with FFA to design and engineer the "Strong Arm" device further suggests (even though it is not dispositive) that, as of August 2004, representatives of Gradall believed a joint venture agreement existed between the parties. Although defendants contend that the August 2004 letter was "prepared simply to ease the minds of buyers [of the "Strong Arm"], not to create an indefinite partnership," FFA has presented competent evidence indicating that such characterization of the letter is not entirely accurate.  Specifically, according to the deposition testimony of Joel Domangue, FFA's Project Manager and the employee who jointly prepared the letter with Gradall's President, Michael Haberman, while the letter was designed to provide some level of comfort to purchasers of the "Strong Arm" product, the letter was not limited to a single transaction with a potential purchaser, and it was also intended to set forth the relationship between the parties. *See*, Deposition of Joel Domangue, Exhibit "C" to defendants' motion and Exhibit "D" to FFA's opposition, pp. 49-51, 114-115.  Domangue testified that, given the magnitude of the project and the fact that the "Strong Arm" product was new, the letter was designed to inform buyers that the companies involved in the project were viable and that they had formed a partnership/joint venture relationship to produce the "Strong Arm" product together ("a certification that the two companies had worked together in the design, development, engineering, sales, marketing, etc. of the project").[16] [17]

---

[16] *Id.*, p. 115 ("The context of [the August 26, 2004 letter] being developed was to solidify our relationship so that as we moved forward with sales, people knew it was a combined effort between two companies who basically were premier manufacturers in their own field that combined together to create this new, innovative product . . .

13

The August 2004 letter makes specific reference to the fact that the "Strong Arm" device, the Gradall FA-50 teleboom, and all other products designed and developed under the program between the parties were protected "under the proprietary sales, marketing, and manufacturing agreements executed by Gradall and FFA."  The only agreement actually executed by both parties, of which the Court is aware, is the 2004 "Partner Agreement."  The Court therefore finds that a genuine issue of material fact exists as to whether the parties intended the 2004 "Partner Agreement" to constitute the contract between them, even if they agreed to put that contract in a more formal and detailed format at a later date.[18]

### (2)   Juridical entity or person element:

As to the second element required for a partnership/joint venture agreement, the Court finds the fact that FFA and JLG/Gradall did not actually create a new legal entity or juridical person to carry out the design, engineering, and marketing tasks relative to the "Strong Arm" device is not dispositive.  It has been held that, when two or more persons

---

Because that was always important to me that people knew this wasn't just some whim that Ferrara went off on, that it was a lot of time and effort and engineering, and it was a partnership with a company the size of JLG and a company with the reputation of Gradall that we moved forward to develop this product.  That's why that [August 26, 2004] letter was done").

[17] Michael Norman of JLG/Gradall also admitted that a partnership existed between FFA and JLG/Gradall in an email to Mr. Ferrara dated June 19, 2007.  *See*, R. Doc. 25-11, Exhibit "I" to JLG/Gradall's motion (noting that the reason JLG/Gradall had not done more to promote the "Strong Arm" device was "because that [was] supposed to be Ferrara's role in this partnership").

[18] The fact that the parties invested extensive effort and money in the development and marketing of the "Strong Arm" product program despite the fact that a more formal, written contract was never executed by both parties suggests that the parties believed they were bound by their initial "Partner Agreement" setting forth the general elements of the relationship between them.

or concerns enter into an agreement which the law defines as a partnership or joint venture, regardless of whether they specifically create a new legal entity, such agreement "becomes a juridical entity, and liability of the parties is determined by law relating to partnership or joint venture, even if the parties had not thought of such consequences or even sought to avoid such consequences of relationship."  *Peterson v. BE & K Inc of Alabama*, 95-0005 (La. App. 1 Cir. 1995), 652 So.2d 617 (Joint venture relationship was found even though parties expressly stated in their agreement that they "did not intend to form a partnership or create an agency relationship").[19]  Thus, despite the defendants' contention to the contrary, it is not required that FFA and JLG/Gradall have created a new juridical entity with its own name, bank account, and tax returns to have established a joint venture/partnership.  As FFA notes in its opposition, La. C.C. art. 2805, in fact, provides that if no name is adopted for a partnership, the business is conducted in the name of all

---

[19] *See*, 7 La. Civ. L. Treatise, Business Organizations § 1.03 (2009)("It is clear that the Louisiana courts, like those in other states, have embraced the idea that the parties' intentions concerning the legal characterization of their relationship are not controlling.  The parties may be held to have 'really' intended to establish a partnership despite their unequivocal statements to the contrary, and conversely, they may be deemed not "really" to have intended a partnership with one another even if that is what they thought they had done"); 7 La.Civ.L.Treatise, Business Organizations § 1.09 (2009)(In setting forth the seven-element partnership test in *Cajun Electric Cooperative v. McNamara*, the Louisiana First Circuit Court of Appeals "appeared to confuse cause and effect when it listed the establishment of a juridical personality as one of the requisites, rather than as one of the consequences of the formation of a partnership"); 52 La. Law Review 493, 496-97, AGENCY, PARTNERSHIP AND CORPORATIONS (January 1992)("What constitutes a partnership is supposed to be a question of law; it is not supposed to depend upon the consent of the parties.  If persons consent to a contract that has the characteristics which the law says are those of a partnership contract, then under the weight of authority in Louisiana, they have become partners with one another because they have consented to a 'partnership' contract– whether or not they understood at the time they consented to the contract how their contract would end up being legally classified").

of the partners, which appears to have occurred here where the "Strong Arm" device was jointly marketed and sold under the FFA and Gradall names.

### (3)    Contribution, risk and profit elements:

As to the third, fourth, and fifth elements of the partnership/joint venture test, it appears, based upon the 2004 "Partner Agreement" and the August 2004 letter from Gradall to third parties, that there is, at least, a genuine issue of material fact as to whether the design, engineering, and marketing of the "Strong Arm" device was a joint effort contributed to by both FFA and JLG/Gradall.  Certain duties, such as the design and improvement of the "Strong Arm" device, were apparently shared by the parties, while other duties, like the marketing and sale of the device, were solely the responsibility of FFA.[20][21] Furthermore, FFA has produced competent evidence indicating that Gradall invested a large amount of effort and funds in the development and promotion of the FA-50

---

[20] *See*, Affidavit of Ferrara, Exhibit A to FFA's opposition, ¶¶7, 8, 12 (FFA was responsible for marketing and demonstrating the "Strong Arm," for making modifications to the chassis, and for assuring the "Strong Arm's" compliance with the National Fire Protection Association.  Gradall was responsible for obtaining the Fifth Man Nozzles from American Eagle through a separate supply contract, manufacturing the FA-50 boom, and attaching the boom and nozzle to an FFA chassis shipped to Gradall's New Philadelphia, Ohio factory.  FFA then completed the fire truck body at its factory in Holden, Louisiana.  FFA and Gradall jointly participated in field testing of the "Strong Arm" and jointly addressed various in-service issues with the product.  Numerous modifications to the "Strong Arm," and its components, were made from 2004 to 2008 through the joint efforts of FFA and Gradall).

[21] FFA's Domangue testified that FFA and JLG/Gradall "got in the business together" and "co-developed [the 'Strong Arm'] product."  He stated that FFA and JLG/Gradall "shared time, expense, effort, commitment, . . . but then we [ran] into some challenges . . . and [FFA wasn't] meeting the numbers that [JLG/Gradall] thought [FFA] should have been meeting, [and JLG/Gradall] wanted to bail on the project."  *See*, Domangue deposition, Exhibit "C" to JLG/Gradall's motion, p. 142.

telescoping boom that is a component part of the "Strong Arm" device, such that Gradall risked significant monetary loss in the event the "Strong Arm" device program was not successful.   *See*, JLG/Gradall's Responses to Supplemental/Amended Requests for Production of Documents, Exhibit "G" to FFA's opposition, wherein JLG/Gradall set forth the costs  incurred in the development and promotion of the FA-50 boom:  (1) Engineering costs: 9,549 man hours at $95.00/hour, for a total engineering cost of $907,155.00; (2) Advertising costs: $71,321.27+ (additional expenses for participating in three trade shows and video costs are not included due to a lack of invoices); (3) Cost for FA-50 Demonstration Unit: $156,257.19; (4) Warranty Costs for all FA-50 booms produced: $104,404.41; (5) Purchase order from Gimaex: Unit is still in Gradall's factory and unpaid in an amount of $245,625.00; (6) Product Sales Agreement from American Fire Eagle (no monetary amount specified); and (7) Powerpoint presentation put together by Gradall for the Alamo Purchase, which shows Gradall's expectation for the FA-50 boom (no monetary amount specified).[22]

　　　　Finally, although the "Strong Arm" device itself was apparently marketed and sold by FFA and FFA was therefore the entity to receive any direct profits resulting therefrom, the Court agrees with FFA that Gradall's suggestion that it "did not stand to gain or lose

---

[22] An email from Michael Norman of JLG/Gradall to Mr. Ferrara dated June 19, 2007 also indicates that JLG/Gradall invested the following efforts and money in the "Strong Arm" project: (1) Development of the initial website; (2) Turning over of 200 leads from initial email blasts to FFA; (3) Sending funds to FFA when funds were requested; (4) Helping pay for the Interschutz show in Germany (where all of FFA's international sales derived from); (5) offering a full time demo person that FFA did not use; and (6) handling warranty issues in a timely manner and providing a service person whenever FFA requested.  S*ee*, Exhibit I to JLG/Gradall's motion, R. Doc. 25-11.

money on the sale of the Strong Arm" is inaccurate.[23]  As the sole supplier of the FA-50

telescoping boom component for the "Strong Arm" device, JLG/Gradall would certainly

profit, at least indirectly, if the "Strong Arm" device was successfully marketed and sold --

*i.e.*, the more "Strong Arm" devices that were demanded and sold, the more booms

JLG/Gradall could sell under an exclusive agreement with FFA and make profits therefrom.

Accordingly, the Court finds that genuine issues of material fact exist in this case as to each

element of the partnership/joint venture analysis, precluding summary judgment.[24]

> **(B)** **If an enforceable partnership/joint venture contract exists, was it properly terminated?**

Lastly, the Court finds that a genuine issue of material fact exists relative to

JLG/Gradall's argument that, even if an enforceable partnership/joint venture contract

existed in this case, it properly terminated that contract.  JLG/Gradall first contends that,

if the 2004 "Partner Agreement" constitutes the contract between the parties, it lacked a

specified term and is therefore governed by La. C.C. art. 2024, which provides: "A contract

---

[23] Furthermore, JLG/Gradall belies its own argument that it did not "stand to gain or lose money on the sale of the Strong Arm" by a statement made in its reply memorandum.  Specifically, on page 5 of its reply, JLG/Gradall states that it has "continuously encouraged FFA to sell as many ["Strong Arm"] units as humanly possible so that both companies could profit."  *See*, R. Doc. 36, p. 5.

[24] Since the Court finds that there is a genuine dispute as to whether the relationship between FFA and JLG/Gradall was a partnership/joint venture contract, the Court obviously disagrees with JLG/Gradall's assertion that the agreement between the parties was "unequivocally a contract of sale," to which the Louisiana Civil Code articles on Sales would apply.  The Court agrees with FFA that, while sales of the "Strong Arm" device were the purpose of the relationship between the parties and JLG/Gradall was a seller of a component part for that device, the major investments of both parties in the development, refinement, and marketing of the "Strong Arm" product, as demonstrated by the evidence before the Court, suggest that the parties contemplated something more than a mere sales contract.

of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party."  La. C.C. art. 2024.  FFA, on the other hand, contends that La. C.C. art. 2024 is typically applied in the context of "employment at will" contracts and explains that, in cases involving relationships between business entities, like the present matter, La. C.C. art. 1778 has been more often applied.  *See,* R. Doc. 32, p. 17, citing *Wilson Oil Co. Inc. v. Central Oil Supply Corp.*, 557 So.2d 753 (La. App. 2 Cir. 1990).  Article 1778 provides:

> A term for the performance of an obligation is a period of time either certain or uncertain.  It is certain when it is fixed.  It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event.  It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.

La. C.C. art. 1778.  When a contract does not have a stipulated term, courts will infer a "reasonable term" from "the nature of the contract and the circumstances of the case, including the amount of time necessary for the supplier to recoup its investment and the prevailing practice with similar contracts."  *Wilson Oil*, at 758.[25]

---

[25] *See also, Leblanc v. City of Plaquemine*, 448 So.2d 699, 703 (La. App. 1st Cir. 1984)(When there is no express term in a service agreement, a reasonable term is "inferred from the nature of the contract and the circumstances of the case"); *Castille v. City of Opelousas*, 509 So.2d 723, 725 (La. App. 3 Cir. 1987)(Among the circumstances considered in determining a "reasonable term," where no term was expressed in a service contract, were the manner of the parties' execution of their obligations and pertinent usage and custom); *Caston*, at 65 ("What constitutes reasonable notice must be determined in the light of the facts of the particular case."  Reasonable notice of the intention to terminate contract for photographic services was not given where the hospital gave no notice of intent to terminate but merely stopped photographer from taking photographs of babies in the nursery.  The photographer who had been terminated without reasonable notice was entitled to recover the profits he would have made during the period equal to the reasonable notice to which he had been entitled).

Thus, regardless of whether Article 1778 or Article 2024 is applied in the present matter, in order to properly terminate a contract with FFA which lacked a specified term, JLG/Gradall was required to give "reasonable notice" prior to termination, as even the comments to Article 2024 require that the parties to a contract terminable at will must comply with the "overriding duty of good faith," meaning that "reasonable advance notice" is typically required to "avoid unwarranted injury to the interest of the other party." *See,* Comment (e) to La. C.C. art. 2024; *Caston*, at 65 (Where a contract between a hospital and a professional photographer did not provide for a specific term, it was terminable upon giving of reasonable notice).  Additionally, although disputed issues of fact exist as to whether a partnership/joint venture agreement existed between the parties, the partnership/joint venture agreement article regarding termination also requires that reasonable notice be given prior to termination of a partnership or withdrawal of a member. *See*, La. C.C. art. 2822 ("If a partnership has been constituted without a term, a partner may withdraw from the partnership without the consent of his partners at any time, provided he gives reasonable notice in good faith at a time that is not unfavorable to the partnership"); *Roy v. Gravel*, 570 So.2d 1170 (La. App. 3 Cir. 1990)(La. C.C. art. 2822 "fully establishes that Roy, as a partner in a partnership without a term, was entitled to and did in fact terminate the partnership by giving reasonable notice to the other partners").

Accordingly, if the 2004 "Partner Agreement" and the August 2004 letter from Gradall are ultimately considered to be the contract between the parties, regardless of whether that contract is considered to be a partnership/joint venture or not, the Court will have to determine whether Gradall gave FFA "reasonable" advance notice of its intention to terminate that contract prior to doing so in order to decide whether Gradall properly

20

terminated that contract. In so doing, the Court will have to look at the manner of the parties' execution of their obligations under their contract and the usages and customs in the industry. As FFA notes in its opposition, the Court will have to examine factors such as the "general development time for this type of fire service product based upon the market in which the 'Strong Arm' was competing and the typical duration of the type of contract at issue in the industry," among other factors. *Caston*, at 65 (finding that the plaintiff should be able to recover what he would have made during the period equal to the "reasonable notice" to which he would have been entitled had the hospital properly notified him of its intent to terminate the contract. The court examined the initial investment made by the photographer and the expected profits that would have accrued during that time period and found that six months notice was reasonable under the facts of that case). Since such factors have not been addressed by the parties in relation to the present motion,[26] summary judgment is precluded on the issue of whether Gradall properly

---

[26] JLG/Gradall concedes that it was required to give FFA "reasonable notice" of its intent to terminate any contract that may have existed between them, regardless of whether that contract was the "Partner Agreement," the "Term Sheet," or the "Product Sales Agreement;" however, JLG/Gradall has not supplied any argument or evidence with its motion or reply memorandum concerning the factors mentioned above for the Court to consider in determining whether "reasonable notice" was given. Instead, JLG/Gradall simply contends in a conclusory fashion that, irrespective of whether this Court believes a valid contract ever came into existence and irrespective of what contract the Court believes is binding, it "properly terminated its relationship with FFA by giving reasonable notice on February 8, 2008." *See*, R. Doc. 25-14, p. 2, 4.

Mr. Ferrara testified during his deposition that Gradall did not have a right to terminate the contract between FFA and Gradall in February 2008 because there had been "a lot of problems" with Gradall's product, and FFA had to "go back and correct" those problems "to meet fire service requirements." *See,* Mr. Ferrara's deposition, Exhibit B to defendants' motion, p. 32. Mr. Ferrara further testified that correcting those problems was an "ongoing process" which involved refinement of JLG/Gradall's product by engineers working for both FFA and the defendants. *Id.*, p. 32-33. He stated that,

terminated any enforceable contract existing between it and FFA.[27]

────────────────

"[y]ou just can't develop a product in the first year and think that you're going to get X amount of sales in so many years."  *Id.*, p. 33; *See also*, Mr. Ferrara's affidavit, Exhibit A to FFA's opposition, ¶9 ("The development of the Strong Arm involved significant modifications to a basic Gradall boom and to the FFA fire apparatus chassis to be utilized.  Various issues related to stability of operation, hydraulics, control system, and other fireground/automotive operational characteristics needed to be addressed by FFA and Gradall to produce a complete and unique firefighting system, and these areas were tested and improved from 2004 through 2008").

Thus, the determination of whether or not JLG/Gradall gave FFA "reasonable notice" and properly terminated any contract that may have existed between the parties certainly involves an examination of the development time for the product at issue (*i.e.*, the amount of time FFA should have been allowed to develop the product and recoup its initial investment prior to termination of the contract).  *See also*, Deposition of FFA's Joel Domangue, Exhibit C to defendants' motion, p. 30 (where Domangue discusses the fact that the fire service industry is "very tradition-driven" and that he warned JLG/Gradall "from day one" that sales of the "Strong Arm" were not "going to be easy; it wasn't going to happen overnight," that JLG/Gradall would "have to be patient," and that JLG/Gradall would have to "stick together" with FFA "through this thing because it's going to take us a while to get there").

[27] Because the Court has determined that genuine issues of material fact exist as to whether the 2004 "Partner Agreement," in combination with the August 2004 Gradall letter and the parties' course of business dealings, constitute an enforceable contract between the parties, precluding summary judgment, the Court finds that it need not address the defendants' additional arguments concerning whether or not the subsequent 2004 "Term Sheet" or the 2005 "Product Sale Agreement" constitute a valid contract between the parties.  In the event a jury determines that the "Partner Agreement," Gradall letter, and course of business dealings do not constitute an enforceable contract, it can proceed to determine whether the "Term Sheet" or "Product Sale Agreement" is a valid contract between the parties and, if so, whether Gradall properly terminated either of those contracts under their terms.

## RECOMMENDATION

For the above reasons, it is recommended that the Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract and/or Breach of Partnership/Joint Venture (R. Doc. 25) filed by defendants, JLG Industries, Inc. and Gradall Industries, Inc., should be **DENIED**.   It is further recommended that the Motion for Summary Judgment on Counterclaim (R. Doc. 26) should be **DENIED AS MOOT**.

Signed in chambers in Baton Rouge, Louisiana, December 21, 2009.

**MAGISTRATE JUDGE CHRISTINE NOLAND**